Mr. Justice Evans
delivered the opinion of the Court.
By the Act of 1788, which is copied in the Act of 1825, the commissioners of roads have “ full power to cut down, and make use of. any limber, wood, earth, or stone, in or near any highway, &c. for the purpose of repairing the same, as to them shall seem necessary.” The only restriction on this power, is contained in the act of 1826,. which prohibits the use of rail-timber, where other and adequate timber can be had, at, or near the same place. For obstructing and opposing a commissioner of roads in the exercise of the powers granted him by this act, the defendant was indicted, and on the trial, convicted* On the hearing of the case in this court, it was contended that the act under which the commissioner acted, was unconstitutional and void. If this be so, then the defendant was justifiable. If not, he was properly convicted, and the motion must be refused. The general power of the legislature, to appropriate private property for any and every public use, against the will of the owner, and without compensation, is not involved in this case; every thing which is said in this opinion must, therefore, be considered as applying exclusively to the case before the court. The defence of the defendant is founded on the assumption, that the commissioner had no right to use his timber to repair the bridges on the road, without making him compensation.
Until the question was gravely made in this case, I had supposed it was the well settled law of this State, that the legislature had the power to order roads to be opened, and to use So much timber, earth, or rock» as was necessary to keep the road in repair; and to do this contrary to the will of the owner, and without making previous compensation. This question was first discussed in the case of Lindsay vs. the commissioners of streets, but the court was equally divided, and the plaintiff failed in his application for a prohibition. 2 Bay, 38. But in the case of Ford vs. Whitaker, involving directly the question, whether the commissioner, Whitaker, had the power to open a road through Ford’s tract, the point was conceded by the counsel, and treated as a settled question by the court.
In the case of Eaves vs. Terry, which was an action against a commissioner for cutting down the plaintiff’s trees, the defendant justified the act, for the purpose of repairing the road. His defence was *105 Sustained, although the trees were within the enclosed grounds of the plaintiff. The general right of the commissioner to use timber, was not questioned by the counsel, of any member of the court. 4 M’C. 425. The judge who delivered the opinion of the court says, “that since Lindsay's case, the constitutional right to exercise this power purely for public purposes, has not, as far as 1 can learn, ever been seriously doubted.” 2 Bay, 38. In all these cases, the authofities referred to are Singleton’s case, and Withers’ case, neither of which are reported. , But in the case of Singleton vs. The Commissioners of Roads, the court say the question had been settled oil a former occasion, referring to these cases as authority. 2 Nott & M’Cord, 526. The case of Dunn vs. The City Council, was a case where compensation was directed, and is not therefore analogous to this. 1 Nott & M’Cord, 387. In case of Starke vs. M’Gowen, the power m the legislature was expressly recognized; and in the case of Patrick and Manigault vs. The Commissioners of Cross Roads, the question was directly made and decided. 4 M’Cord, 543. But it has been argued, that all these cases, as well as the annual legislation for laying out roads, are a violation of the constitution, and therefore of no authority.
Is there any force in this argument? Has the legislature for the last forty-five years been annually passing laws in violation of the constitution, and has the judiciary been 'participes criminis in this violation, by carrying these laws into effect!
In the investigation of this subject, I do not propose to inquire ■whether the defendant, or any other person, may nothave a just claim for compensation, who has contributed, in this way, beyond his equal portion of the public burthen. All I mean to say is, that he has no constitutional right to demand compensation, as a condition precedent to the use of his property. The propriety of compensation, where the injury has been great, seems to have been recognized by the legislature in the case of Mr. Alston; who was paid for his land appropriated to the public use, by running a road through his rice plantation on Waccamaw.
That part of the constitution which it is supposed restrains the exercise of the power here contended for, is the 2d section of the 9th article, which is in these words : “ No freeman of this State shall bo taken, or imprisoned, or deprived of his freehold, liberty, or privi-léges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers, or the law of the land.” These latter words, “ law of the land,” it is contended, are a restraint on the exercise of the power as claimed and exercised by the legislature. I would remark here, that a road is *106 but an easement, or, as it is sometimes called, a servitude. The own» er is not deprived of his right of soil; if the road be discontinued, the owner may then appropriate it to his exclusive use. It might be sufficient for the purposes of this case, to say, that this question has been decided in all the cases above referred to, and especially in the case of Patrick and MauigauLt vs. The Commissioners of Cross Roads, where the question was made and discussed by the learned judge who delivered the opinion of the court. 4th M’Cord, 441. Independently, however, of authority, it seems to me the proposition can be sustained, by well settled and recognized principles. The words “ law of the land,” the framers of our constitution borrowed from magna charta; their meaning and import have been frequently discussed, but commentators are not agreed in the true construction. What others, more competent have failed to effect, 1 shall not attempt.
That this clause of the constitution, as well as magna charta, intended to guard the life, liberty, and property of the citizen, against the exercise of any new or arbitrary power, I can entertain no doubt; aud so far all the commentators are agreed. If this were a new power claimed by the legislature, and now for the first time attempted to be exercised, it might,be a grave question, whether the right of eminent domain would authorize the appropriation of private property for any public use, unless the act making the appropriation contained a provision for compensation. Such seems to have been the opinion of Chancellor Kent. 2 Kent’s Com. 275. But this is not the fact. This power has been recognized and exercised, from the first settlement of the country. The first act upon this subject was passed, as appears from the index prefixed to Judge Grimke’s Collection of Public Laws in 1682 ; and from that time to this, scarcely a year has passed, without the passage of some law for laying out public roads., As early as 1721, an act was passed, giving to. the commissioners of the roads, the power to use the adjacent lumber for the repairs and construction of bridges. During all this time, not one word is to be found in any act, on the subject of compensation, except in the act of 1723, which d rects the commissioners to pay for certain description • of timber used in the construction of framed bridges, such reasonable price as they may think fit. The same rules of construction are to govern in' the interpretation of the constitution, as in other instruments. It is to have effect according to the meaning and intention of its framers ; what then did the Convention, which adopted the constitution, mean by the words, “ law of the land.” In the case of Patrick and Manigault vs. Commissioners of Cross Roads, 4th M’Cord, 544, the court says, that “ What has long *107 existed, is under any of the definitions of these words, the law of the land.” It can scarcely be supposed they were intended as a prohibition of a power exercised by the legisláture, from the first settlement of the State, and under every change of its government, whether pro» prietary, regal, or republican, and which was exercised at the first session of the legislature, under the constitution, and I believe I may say at every session since. This cotemporaneous exposition, the continued exercise of the power by the legislature for a period of 150 years, and the various cases which have been decided by the courts, ought, I think, to have put this question to rest. Independent, however, of these, there is still another view, which to me seems equally conclusive. It is to be remembered, that all the grants of lands in this state, are derived from the lords proprietors, the crown, or the State. Without the right of ingress and egress, real estate would be of little value. Roads are essential to its enjoyment. When,- therefore, land was granted, it was with the tacit condition, that the grantee should have a way through the surrounding land ; and as a corollary to this proposition, other grantees should have a similar right over his land. B. 1, Tit. 8. There are two things, says Domat, destined for the common use of all mankind : the first, by nature, as seas, rivers, and the like ; and the second, by civil polity, as roads, and streets in a town. The existence of roads are essential to the well being of society, and the right to make them, has been exercised by the government of every civilized country.
I think, therefore, it may be considered, that the power here contended for, is a tacit condition of every grant made in this State. Upon this ground the question is placed, in some of the cases which, have been decided. In Eaves vs. Terry, the decision was put on this ground. “All the cases,” says the judge, “proceed on the ground that there is a tacit reservation in every grant of a freehold of so much as may be necessary for the ordinary purposes of making roads and highways ; and as a part of the eminent domain, the legislature has a right to set it apart for that use, whén the public convenience requires it.” But it has been said, although this power may be exercised by the legislature, yet it is not transferable to the commissioners of the roads, or any other person.. In the very nature of things, this power, so far as it is involved in this case, cannot be exercised otherwise than by the intervention of agents. The legislature prescribes the rules, but its execution must be intrusted to others. The law makes it the duty of the commissioner to keep the road in repair; and to enable him to perform this duty, vests him with the power of *108 .using any forest timber, at or near the highway, or bridge, to be repaired.
Filed 20th May, 1836,
The other questions were facts to be decided by a jury, and their decision is conclusive.
The motion is refused,
JOSIAH J. EVANS.
We concur,
DAVID JOHNSON,
JNO. B. O’NEALL,
WJVL HARPER,
A. P. BUTLER,
B. J. EARLE,
RICHARD GANTT,
Opinion of
Chancellors Desaussuee and JohnstoN,
Chancellor Joiinstoh. Í very much doubt whether an authority, especially a general authority, can be delegated to take private property for general use, unless the law authorizing the taking has provided for compensating the owner; and whether in such case, it is a criminal offence for a citizen to prevent his property from being taken from him. It is. a subject of much difficulty; and very nearly concerns the liberty of the citizen; and it is a very narrow view of it, to confine ourselves to the present case, or the species of property taken m the present instance, or even to the present generation. A law may as well be passed to take cultivated trees as native timber, or to take the land itself, or the crop growing on it, or the houses erected on the land, as to take either; and if these can be taken without compensation, and it is made a crime to stand on the defensive, where is the liberty of the citizen?
' Whenever a safe practical rule shall be suggested, which, while it shall guard private rights on the one hand, and- shall prevent the functions of government from being vexatiously embarrassed on the other, I shall be prepared cordially to adopt it. At present, I am not prepared to give a' definitive opinion upon the subject.
But, apart from this consideration, I think the verdict was unwarranted. The question, to be sure, was fairly submitted to the jury, whether timber adequate to the repairing of the bridges could, have been obtained near the spot, without resorting to that, which the defendant forbade the commissioner to take; but I think the proof was clear — beyond doubt — that there was an abundant supply of such timber. - .
The commissioner would not put up with that which was adequate,, which was all he had a right to, but was determined to have the very choicest of all that could be found. It would have taken a little more work to put down the oak, so as to prevent its warping, than the pine, which would not warp so readily. But, upon the same principle, he plight have claimed the most precious timber known, if it had happened to grow within reach of his hands.
The utmost authority the commissioner could lawfully claim, was *109 to take adequate timber. The-defendant did not obstruct him in the performance of this, his only lawful authority; but left him at liberty to take such timber, and even pointed it out to him; and it was enough to get this without .compensation.
1 am for setting the verdict aside, as .grossly against evidence.
J. JOHNSTON.
I concur,
HENRY W. DESAUSSURE.
The opinion of
Mr. Justice Richardson.
The primary question presented by this case, is allied to the one so often mooted, to wit: Whether the commissioners, of public roads have the constitutional authority to take private lands for public roads. But the immediate question is : Have they the right to select timber •trees for the repairs of the roads, without compensation to the owners. By the general road act of 1788, (P. L. 445,) the commission, ers are authorized to lay out, and make roads ; and in order to keep .them in repair, may take the trees in or near the roads. But by the act of 1817, the power of making roads is taken from the commissioners ; leaving them, only the authority to repair, as it stood, under the act of 1788, and to take trees in or near the roads, for that purpose. Before the repealing act of 1817, the right of the commissioners to make public roads, is supposed, in some recent cases, to have been judicially established by the decision of the'Constitutional Court, in the case of Lindsay and others vs. the Commissioners of East Bay street, (2d Bay, 38.) And we find such doctrine recently recognized in the case of Manigault and others vs. Commissioners of Cross Roads, (4 McCord, 541.) But it cannot escape observation, that in both those cases, the commissioners acted as the mere executive agents of the legislature, under acts passed for the purpose of opening particular named streets.
It is one thing, and may be constitutional for the legislature to have opened specific roads — (which is what was accustomed to be done in our earliest civil history) — but quite a different question arises, when the legislature attempts to delegate to any tribunal whatever, a general power to open roads at ^discretion, and to keep them in repair, by taking trees as often as deemed necessary, without compensation. It is this transfer of power, which now makes the proper question before the court; and the incident of taking remote trees, is complained of. And here, let me remark, that it will be found upon investigation, ■that such a transmission of the legislative power, commenced no sooner than about the year 1721; and that the general power to take trees to repair roads, began with the act of 1788. Before 1788, the power was confined to bridges ; and was even then very qualified in extent; so that the truth is, that neither the one, nor the other, has been sanctioned by an antiquity coeval with our civil history, as has been often supposed, in argument, at different times.
*110 Such is the view, under which, it appears to me, that the questions now made, are still open. And I enter upon the discussion with arguments that occurred to me, dimly, at the time of hearing the case but which, I then thought, worthy of public consideration; and which, after some investigation of the general doctrine, and the examination of all our reported cases, have left a strong conviction, that the case'of Lindsay, while, in itself, it decided no doctrine whatever, yet left a false gloss, which has unduly beset other successive cases; and may lead to errors which ought to be arrested.
The power of using private property for public purposes, called the eminent domain, is permitted, only, for the public safety and general convenience. Such a high prerogative, which arises from the necessities of government, belongs only to that tribunal which exercises, practically, the sovereign power of the whole civil society, and should be restricted to it alone, and never confided to other hands. I need scarcely remark, that it ts the greatest power, coupled with the highest trust, and delegated to the immediate representatives of the people, in the confidence that they will not abuse their eminent domain ; and therefore, it may not be delegated to any inferior tribunal. I will not quote a mere maxim, upon such a subject. The rationale strikes every understanding, and holds correspondence with the •best interests of us all. To confide in a given trustee, is not confiding in all his agents. But such a distinction could not find a place in Lindsay’s case, or Manigault’s.
The acts of the legislature,, before the court, in those cases, were specific. The one, to join East Bay street to South Bay. The other, to connect America street with Judith street. In both, the commissioners of streets were ministerial agents, each for a named instance only ; and were not endowed with general power to lay out roads, at discretion. And, accordingly, those cases can decide no more, than that the legislature itself, may, by a specific act, appropriate the lands of an individual citizen, for a public road, without compensation.
In such cases, the legislature itself, exercises the eminent domain, and transfers the use of the freehold to the public ; no other tribunal is put in the place'of the legislature, and the commissioners are executive surveyors only. Take, for example, the great historical instances.
When the Isle of Man was annexed to Great Britain: when the territory of seven of the Lord’s-Proprietors of the Carolinas was transferred to the crown. These were done by acts of parliament. Under our own governments, — when Indian lands are annexed to the States, or to the federal territory, it is done by the legislatures.
A familiar example may be found, whenever we erect a court house in a new district- In all such instances, it is the legislature, itself, that divests private property for public purposes, whatever agents may be employed to see the actual transfer made.
But, let us look further, into our own adjudged cases. In the case of M’Gowen vs. Starke, (1 Nott and McCord, 387,) the act of *111 1811, specifically erects a named public ferry, and of course, the ■question of delegating the eminent domain could not arise.
In the case of Ford vs. Whitaker, (1 Nott and McCord, p. 5,) the plaintiff’s counsel concedes the doctrine, as if settled by Lindsay’s case ; and other cases; whereas, in Lindsay’s case, the judges were equally divided. In Ford’s case, the true point, might have been made; but was not submitted to the court. We are referred’ in this case, also, to Withers’ and Singleton’s cases, for the decision. Withers’ case is not reported ; but, as far as I can recollect, the case is necessarily decided, no more, than that the commissioners may open and repair an old road ; and in Singleton’s case, (see 2 Nott and Mc-Cord, 526,) the only points decided, are, that the word “ public,” in old acts, is synonymous with “ roads ;’ and that the commissioners have no power to lay out roads for individuals. And a hope is expressed, that the uncertain case of Withers will be found to respect •the constitution and magna charta.
Where, then, I ask, has it even been decided, that the commissioners of roads, ever held the eminent domain, and could appropriate private lands, without compensation ; unless I am mistaken in the unreported case of Withers ? And 1 repeat, that of all the cases, so far reported, that of Ford vs. Whitaker, is the only one-in which both the general doctrine and the true distinction, could have arisen; and in it, the former was conceded as a settled point; the latter never was adverted to.
Conceding, then, the general doctrine, that the legislature may exercise the eminent domain as a constitusional power; yet the counsel, throughout all the cases, have, in no one instance, taken the true distinction between the legislsture, exercising their lofty Trust, in a specific instance ; and delegating their sovereign power to Secondary hands. And, assuredly, we are not to shun the exact question, which Dawson’s case fairly presents. The vast privilege of the eminent domain is, in my judgment, the last power that can be. transferred. The legislature may just as well delegate their general power of passing and repealing laws.
There is, however, one other decision, bearing upon the true question before us, which must be noticed. I mean the case of Eaves vs. Terry. (4 Nott and M’Cord p. 125.)
In this case, we find, as usual, Lindsay’s case, M’Gowen’s, Singleton’s, and Withers’s cases, adduced to shew the doctrine settled ; and, of course, the same Inconclusiveness, in the proofs of the Predicate of the argument, is. apparent. In terms, we meet with an instance, in this case, of the eminent domain, being judicially allowed to the commissioners of roads, in the license to take adjoining timber trees to repair the roads. But, over and above the mistake in assuming that former adjudications, had established the doctrine .it. favor of the commissioners of the roads, it is clear, that the distinction between the legislature exercising tbeir trust, and the transmission of it to in. ferior hands, was not insisted on in the argument, nor adverted to in the Decision.
And whenever adjudications are clearly referable to an oversight, *112 omission, or concession of the main question, they decide the parti-culav case'only ; but do not make doctrine for subsequent cases; to which, neither the same oversight, omission, nor concession, belongs.
After an examination, therefore, of all the adjudged cases, I can, in no way, admit it to have been settled by any case, that the commissioners of roads ever had the constitutional' authority to appropriate private-lands for roads, orto take trees, without compensation. While, at the same time, I do admit, that the legislature may have such a power, holding, as they do the practical sovereignty, in this respect, from time coeval with our civil history. That thus much has been fully adjudged, carmot be denied. But, I equally hold it, and must maintain, that it is one of those eminent powers, coupled with a ¿rust, and confidence that cannot be constitutionally delegated to any other hands; although executive Agents may be appointed to enforce practically the eminent domain of Government, under a special act, which enacts the particular Instance ; or orders the specific streets or roads to be marked out, by ministerial agents. For myself then, I do not feel that the court is fettered, in the case now before us, by any former decisions, when fairly understood ; while it is plain, that the current of opinions have set one way, ever since Lindsay’s case in 1795. But that is not enough, if the true constitutional doctrine should be found leading to a different conclusion.
The authority to use private property for public purposes, without compensation, .if permitted at all, can be exercised even by the sovereign power of government, only in those cases where the common safety or convenience demands the sacrifice of individual interest for a great general public good.
Is there any such authority in any branch of government» is now the Question ; and if the negative can be shewn, I trust we shall ponder long, before we proceed a step farther, than the decision in Mani-gault’s case ; and say, that the legislature not only have the authority,but may delegate a part of it to the commissioners of the roads.
Sir Wm. Blackstone, the most authoritative commentator upon the principles of English constitutional law, gives us the doctrine in these words : “ So great is the regard of the law for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community.” “ If a new road were to be made through the grounds of a private person,” &c. &c. “ the law permits no man, or any set of men, to do this, without the consent of the owner of the land,” &c. &c. “ In this, and similar cases, the legislature alone can, and indeed frequently does interpose, and compel the individual to acquiesce.” “But how?” “Not by stripping the subject of his property, in an arbitrary manner.” “ But by giving him full indemnification and equivalent, for the injury sustained.” (1 Black, p. 139.) If we look into the English highway acts, we find the principle of full compensation held sacred. (See 13-Geo. 3, ch. 78.)
This is the English rule ; and I may add, that in their practical political economy, that nation adheres to the same rule, in a constant regard for vested rights, however originally obtained. We had lately, *113 á striking instance in their West India act of abolition — while the' ministry yielded to the great national cry for the act, they still required compensation as the condition ; and the constitutional law of the land was held inviolable.
But, let us turn to the great American commentators, upon the sub-' ject of the eminent domain. They aré, Rawle, Kent and Story. And with one accord,- they put the same construction upon the venerable' jurists of Europe, that Judge Waties did in the case of Lindsay.
Chancellor Kent sums up the doctrine upon the subject, and coneludes as follows — “A provision for compensation is a necessary attendant on the due and constitutional exercise of the power of the lawgiver to deprive an individual of his property, without his con-' sent.” “ And this principle in American jurisprudence, is founded, in natural equity; and is laid down by jurists, as an acknowledged ‘principle of universal law.”' 2d Kent’s Com. 275. Chancellor Kent having stated the universal principle, as laid down by Grotius de Jure, B. and P. b. 3. c. 19, s. 7. c. 2. s. 7. Puff, de Jure Nat. et Gent, b. 8. c. 5. 13 and 7. Bynk. 2. J. Pub. b. 2. c. 15. Vattel, b. 1. Ch. 20, p. 244-, And which, by the by, are the very authorities, quoted by the counsel,-against Lindsay’s motion;;and which, Judge Waties then said, (as is now fully argued by Kent,)' well supported Lind-’ say’s motion for a prohibition, goes on and adds — “ It would be a violation of contract, and repugnant to the constitution of the United States, to interfere with private property, except under the limitations,which have beba mentioned.” 2' Kent, 276.
Judge Story, commenting upon the 5th article (amendments) of the' United States’ constitution, that private property shall not be taken for public use,- without just compensation, says — 'This is an affirmance of a great doctrine,- established by the common law, for the protection of private property.- It is founded in natural equity; and is laid down by jurists, as a principle of universal law.” 3d Story’s Com. p. 664. And he adds to the other great writers, Wilson, 3d vol, 303; and- Tucker, (Appendix,) 305-306 — and the cases, specially adjudged, on the subject. 3 Dallas, 194, 235. 1 Peters’ Cond.-R. 99, 111. 1 Black. 138-9 and 140'. 2 Dali. 384.
Counsellor Rawle, (p. 128,) commenting upon the .‘Hit article of the amendments to the constitution of the United States-, says — “ It follows fi om all the antecedent precautions,” (the precautions of the 5th article,) “ that no one can be deprived of life, liberty,- or property, without due process oí law; and the repetition is only valuable, as it exhibits the summary of the whole; and the anxiety, that it should never be forgotten.” Proceeding to the last clause of the same article, he says — “ In some countries,” &c. &c. “ the sovereign makes use of it, (private property,) without ceremony. In others, it cannot be taken from the individual, on any terms, without his own consent. A middle line is the proper course,” &c. &e. “ The people, by declaring that ‘ private property shall not be taken for public use, without just compensation,’ have agreed, that, in such cases, and on such terms, it may be taken.” So much for the American Commentators. They are jurists worthy our profound attention.
Here, let me take occasion to meet a difficulty, which, even, at thisr *114 day, we find raised, in judicial opinions too, upon the terms, of our' State constitution, (9th article, sec. 2,) &c. “ by the law of the land,”' (which is a literal translation of the ‘per legem terra' of magna charta.) The doubt seems to be, (see Manigault’s case,) whether' those terms may not still mean an act of the legislature; and not the due process of the common law “ of Lord Coke and Dr. Sullivan.” But, when we find the same exposition- adopted, without exception, by all succeeding commentators, American and English, Cave’s Eng. Lib. p. 19 — Tucker’s app. 304-5 — Kent, 2- vol. p. 10- — Story, and llawle. And, when to these authorities, we add the practical fact, that in the 5th and 6th articles of amendments of the United States’ constitution, we have adopted the very expositions, exceptions, and understandings, laid down by Coke and Sullivan, and embodied them in plain modem English words — who, I ask, can reasonably continue to doubt, that the “ legem terra" of magua charta — “ the law of the land” of ©ur own State constitution; and “ the due process of law” of the United States’ constitution, are precise synonymes; with their true sense and proper undertsand-ing, cautiously set forth in the federal ■constitution.
- Upon this, perfect amity between our constitutions, and the source of both, as expounded by the best commentators, permit me to offer one authority; which, I think, must settle the meaning of “ lex terra." “ The right of personal security, (says Chancellor Kent, 2 vol. p. 9,) is guaranteed by provisions, which have been transcribed into the constitutions, from magua charta, and other fundamental acts of the British Parliament,” &e. He then details the provisions of ihe 5th and 6th articles for personal security. And proceeds — “ The constitution of the United States, and the constitutions of almost every State, contain the same declarations, in substance,” &c. and they must be regarded, as fundamental doctrines in every State, áse. áse. “ It may be received,” (he continues,) as a self-evident proposition, universally understood,” &c. “that no person can be taken,” <fcc. “ or disseised of his freehold, or liberties, or estate,” &c. “ or deprived of life, liberty, or property, unless by the law of the land, or the judgment of his peers.” “ The words, by ihe law of ihe land, &c. are understood to mean, due process of law, that is, by indictment, or presentment of good and lawful men.” 2 Inst. 50. The words, “ per legem terra,” “ by the law of the land,” and “ due process of law,” liave, then, one fixed meaning, well expounded, recognized, and adopted throughout the United States.
In what book, then, of good authority, it can be found, written, that even the legislature can disseise the freeholder, without adequate compensation, I know not, except, in some of our own recent decisions. These, I grant, are to be respected as far, as they go. But decided cases serve for the illustration of principles; and are binding, in after-cases, precisely similar, and no other. In no instance, whatever, does the law-maxim, “ when the reason ceases, the law ceases,” apply, with greater force, than, in the application of adjudged cases. Concessions, oversights, or acquiesences, depend upon the parties to a suit. These mey lead to a peculiar adjudication; and form prece *115 dents for similar cases only. Were it otherwise, a litigant, by omitting a point, or acquiescing in an inference, in some trifling case, might change, or modify a principle of law, or purpose, to suit a case ■of greater interest,’ to himself. '
Take, for example, a case like the one before us. One commissioner sues the rest, for taking his trees. The plaintiff denies the legislative power of taking private property, without compensation. But he acquiesces in the inference that if the legislature have the power, they had the right to tvanfer it to the commissioners of roads. (This is Eaves’ case.) Afterwards, a stranger sues the former plaintiff and his brethren, for a similar trespass. The facts are exactly the same. But can there be a doubt, that in this second action, the plaintiff may make a new question, by denying the inference, before acquiesced in; and contending, that although the legislature hold the supposed power, yet, that like other trustees, they cannot transmit their high trust to the commissioners of the roads ? This is the plain distinction between Eaves’ case and Dawson’s. In Eaves’ case, the inference was, “ in posse,” only ; but here, it is “in esse.”
And shall we, when we can, thus arrest the evil, which sits upon the country, like an Incubus 1 Shall we extend the former case, in order to make it cover the present í I answer, emphatically, No 1 We should rather incline to limit the momentum of such cases, to its minimum ; not raise it to the maximum.
. At all events, I must take the cases as I find them ; and understand them in the sense of their true and necessary decision only. And, as the principles are unerring, I will not despair of their success, finally.
The legislature not unfrequently repeal unconstitutional acts, as inexpedient, when judges cease to offer any opposition. And thus, the constitution eventually prevails from the very inconvenience attendant upon a departure from its principles.
Upon the very point before us, after the opposition in Lindsay’s, Withers’, Singleton’s, and M’Gowen’s cases, had ceased, the legislature thought proper to act; and most wisely took away the very unconstitutional power of the commissioners of roads, in the main article complained of.
It was, but the other day, that, the constitutional right's, and duties of the circuit judges, to meet and decide points of law, were suspended, by an act of the legislature, erecting a separate Court of Appeals. Yet, here, we are again ; and the constitution once more respected, in the allowance of our duties in this court. And, for myself, I cannot but trust, whatever may the personal inconvenience, that this legislative acknowledgment of the true constitutional system, will be found salutary; when it shall have been better digested, and a little improved in its details.
With such experience before us, I do not despair of the time, when Lindsay’s case shall be allowed to have exhibited nothing but learned arguments ; and when all the other cases, which have followed in its course, will be found to have vested no abiding eminent domain, in any tribunal; at least, out of the legislature.
It is not difficult to discover reasons for the successful impression *116 left by Lindsay’s case. It was the first instance of opposition to the opening of roads in South Carolina ; and it was most unfortunate in its characteristics. East Bay was to be extended through open marsh lands, where the tide flowed every twelve hours ; and the new street was obviously destined .to add value to the adjoining lots ; accordingly, people took part against the motion, as unjust, and wanting ordinary comity among citizens of the same town.
The city, too, employed the Telamonian Ajax of the day ; and he held his broad shield over the city claims for extension ; and put his strong hand over the pages of Bynkershock and Yattel: and only lifted up a finger, where the eminent domain was laid down broadly, and without qualification but managed to keep the whole palm upon those pages, from which every commentator upon our constitutions, without one exception, have drawn the conclusion, that private pro - sperty cannot be taken for public uses, unless upon full compensation to the owner.
Let me here add, that in the very case, (Manigault’s,) in which it is, at last, plainly decided, that the legislature may order a street to be laid out, without compensation, the court say, “ It is true, <fec. that the elementary articles, as well as the people, in the constitution of the United States, have said that private property ought not to be taken for public purposes, unless compensation be made. And so say we all, and so have said the legislature on many occasions ; and no doubt will so act, whenever a proper occasion is presented.” Now, I ask, when the constitution, and the people, and all of us, say so, which constitutes an argument, full to overflowing ? Wherefore is it, that we act, not up to such well known doctrine, constitutional provisions, and common sentiments ?
As I take it, it was in this very spirit of accommodating principles, to the feelings of the particular occasion, that Lindsay’s case, which decided nothing, has yet grown up to a ioundation-decision; and is brought up in a circle of similar cases, to prove the main doctrine ,- which we must first take for granted, before we can say that the case has decided the point in controversy. And thus, “toties quoties,” the case and the hypothesis, very conveniently prove each other.
At the original argument, in 1795, the judicious perception of Judge Waties, looked through the mists gathered around the East Bay case, — read Yattel, Bynkershock, and the rest, as Rawle, Kent, and Story, have since read them ; and presented an argument, learned, without ostentation, firm, without offence, and, in my judgment, strong enough to carry conviction home to any mind, not biased by the particular occasion. As his opinion stands first in order of time, so is it, in my judgment, first, in lucid exposition, of our then new constitution.
Before leaving this branch of the case, I must be allowed to notice one argument so often drawn from the history of our civil government. This argument assumes, that commissioners of roads, hafl, from the earliest times, power to layout roads, without compensation, and to repair them, by taking trees near at hand. Whereas, the fact is, that the legislature specifically ordered all public roads up to the *117 year 1721. P. L. 111. In that year, the first general road act was ■passed ; and the commissioners were authorized to lay out roads at ■the equal expense of all the male inhabitánts of their respective divisions ; and so say the court, expressly, in the case of Shoolbread vs. the Corporation. 2 Bay, 63.
It is true, it so happened, that no man ever required compensation .before Lindsay’s case, in 1795.
By the act of 1723, (P. L. 121,) it is enacted, that future bridges, not roads, may be built and repaired, by taking trees, «if the most convenient, adjoinining trees.” And it was, not until 1788, that, for the first time, the eminent domain of taking land for roads, without ■compensation, and repairing them with trees, “ in or near” the roads, was given to the commissioners of roads, (P. L. 444.) We are not, then, to confound the principle of law, that compensation might be required, with the practice of requiring none. In the “ olden time,” nobody asked for compensation, because every one was glad to have a road run through his particular lands. Accommodation, in practice, is one thing ; and the right to compensation, another.
The same thing happened to the Santee Canal Company; and nearly the same to our present Rail Road. Pet, compenstation might have been required, by individuals, at every step of either the one, or, the other of those great highways.
I will conclude this doctrinal branch of the case against Dawson, with observing — That, if any lawyer will read Lord Coke’s Exposition of the 29th chapter of magna charta, on the words “ nisi per legale judicium parium suorum, val per legem Ierres,” (2d Institutes, p. 45,) or Dr. Sullivan’s Lecture on the same subject, (2 vol. 241,) he will have all the English doctrine as admitted, by the best writers; undenied by any commentator since the day of the final confirmation of the great charter. And, if he will then read the 4th, 5th, 6th and 7th articles of amendments to our federal constitution, he will find the same exposition, adopted and incorporated, by the whole United States, in plain, and enlarged terms. And he will find from these conclusive authorities, that the “per legem terras,” of magna charta, “ the due process of law” of the federal constitution, and “ law of the land” of our State constitution, all mean the same thing; and if he does not come to the further conclusion, and, as readily, that, under neither instrument, can private property be taken for public use, without just compensation; and that, this is a part of the exposition of magna charta, expressly adopted, by ourselves, — I am in great error* If, after such examination, and comparison, he will go farther back» and read Vattel, Bynkershock, and the other expounders of the right and powers of government upon the subject, he will find that those eminent jurists support the same sacred rule of adequate compensation for private property, when taken for public uses.
And, finally, if he will consult his own understanding upon the rationale of the eminent domain, he will find, that although the neces. sities of government, and the safety of the whole people, frequently require the exercise of that power; yet, no necessity, nor safety can require the denial, or omission of adequate compensation; but, that such compensation alone, justifies the power, and makes it a gover- *118 mental right. The emergency may excuse the taking; but it is the adequate compensation alone that brings it within constitutional principle. And I will add, such is the true, and only meaning of all the venerable authorities upon the subject, which come within my reach. And, as to those, which I have been unable to consult, personally, I have trusted to the concurring expositions of judges Waties, Story and Wilson — of Chancellor Kent, Counsellor Rawie and Sir William Rlackstone, without' meeting with a single commentator, who does not unite with them, in ascribing the same meaning to those authorities. One would suppose, that the concurrence of such witnesses, would render the truth manifest, that it had lain hid, for ages, at the bottom of the deepest well. But it is not hidden ; we have only to open our eyes; and the true doctrine enters the understanding in the plain English words of the federal constitution, &c. — “ Nor shall private property be taken for public use, but, upon-just compensation.” And the same doctrine is as perfectly expressed, in the words of our State constitution — “ No freeman,” &c. “shall be deprived of his property, but, by the judgment of his peers, or, by the law of the land.” These two prohibitions are identical and universal. The former, is the true interpretation, in modern language; the latter, the literal translation, of the 29th chapter of magna charta. But there is, still, another argument, often resorted to, which should not pass, unnoticed; although, perhaps, it is, really, no more, than a modification, of one, already considered.
It is assumed, that there has been, a long acquiesence in the great powers of the Commissioners of the Roads, which should introduce an exception, by common consent. But, I ask, where can such an assumption be justified?
In no more than seven years, after the highway act of 1788, conferred such powers, and only five y ears after our federal and State constitutions, had recognized private rights, on the subject, Lindsay’s case, 'is recorded in our earliest reporter. And from that time, Ford’s case--M ’Gowen’s — Withers’—Singleton’s—Eave’s—and Manigault’s cases follow, in a regular, and unbroken series, down to the one before the court. And 1 w-mld add — where is the lawyer of standing and experience, who has not been engaged, in professional contestation, upon this subject, in some case, reported, or unreported.
And yet, the same argument is brought up, iu pertinacious Iteration, from its first use, in Lindsay’s case, to the present; as one sanctioned by fashion ; and, as though it constituted the “Response, sans repliquewhile the very cases, in which this fashion is followed, prove, at every step,'that the whole argument rests-upon the tottering basis of an inveterate “ Petitio principii.” Common practice, in order to make a common law custom, must have the reasonable support of common consent. But here, the consent, which is the condition, precedent to the lawful maturity of the custom, is to be chiefly made out through issues of opposition to the same custom. Can such a conclusion, from such premises, be a just and rational deduction ? Upon a controversy which has divided the opinions of the court for more than forty-five years, as, 1 would be impressive, so would I. seek to he gravo, and' deferential; even in combatting what *119 Í deem mere assumption ; and which, I fear, has been so long leading to infractions of a fundamental law of the land. And I appeal for my facts, to the reports o£ our various appellate courts, for thus strongly insisting, that the imposing argument, drawn from a supposed acquiescence in the power of the commissioners of the roads, has no more of a legitimate foundation, than spurious coin has of sterling metal. And it is high time, that it should, in like maimer, be nailed to the counter. Upon this head, I have heard it surmised, that some of the old royal grants reserved the right to make public roads. But I have never met with one, that went farther than white pines, and gold and silver mines, and lead, for the king. And such franchises have been abolished, and have no law to rest upon.
But, having taken up too much time, 1 have done with this argument. And I do so, with the hope, that an apology will be found, in the necessity, which seems to point out such a course, as a duty. My confidence is, that right sentiments are growing up, and will effect a reform. And that, finally, they will settle down into - one of those fixed public opinions, which represses even law, by its moral authority, and becomes itself paramount.
Leaving the constitutional branch of the case, upon which I have thought it right to express opinions of no very recent standing with myself"; and admitting, for the argument sake, that the views hereto, fore presented, may be erroneous, I shall contend ;
1. That under the strict, legal construction of the general road act of 1788 the pine timber of the defendant ought not to have been taken by the commissioners, without compensation.
2. That, admitting the commissioners might exercise a discretion, and take either the pine or oak timber, yet, that Dawson ought not to have been found guilty of a misdemeanor.
The first question is : Are the commissioners hound to take the nearest pine timber, or may they pass by it, in order to obtain other timber, at their discretion, although forbidden by the owner, unless upon compensation ?
The power of the commissioners is given by the 9lh section of the act of 1788, (P. L. 445,) to amend the act of 1785, (P. L. 389,) in the following words : “ The said commissionérs shall have power to cut down, and make use of any timber, wood, earth, or stone, in, or near the said high-roads, &c. for the purpose of making or repairing the same, as to them shall seem necessary.” The words are broad. But when new powers are given to any body corporate, or other inferior tribunal, the grant is to be construed strictly; and no power is to be allowed, unless warranted by the letter, or the necessary intent.
In order to come at the clear intent of the act of 1788, let us revert to the early act of 1721. P. L. 111. By it, roads and bridges are required to be made, and kept in repair, at the equal charge and labour of all the male inhabitants.
In 1721, the true reading of Magna was respected. The act of 1723, P. L. 121, refers to the great grievance to persons living near bridges, from the destruction of their timber, (referring, no doubt, to a practice that had crept in,) but authorizes the commissioners “ to take any convenient timber” for repairing bridges, already built, or to *120 be built, under existing laws, “ paying such reasonable price for' the’ same, as they think fit;” and directs “all other bridges to be built and repaired, with the most convenient adjoining timber, without-paying for the same.” Here, then, in 1723, we find the first step in the new doctrine. But again, by the act of 1785, (P. TL. 389,) the commissioners are expressly authorized, to build and keep in repair, all bridges, by an assessment upon the male inhabitants, from 16 to 50 years of age, which reinstates the true doctrine in-1785. But,over and above, such important historical facts, we haife, in the act of 1723, a clue to the meaning of the sweeping words of the act of 1788. If “ any convenient timber” be taken, it is to be paid for. If the most convenient adjoining timber is to be taken, it is not to be paid for. And by the act of 1785, bridges are to be built and repaired at the joint expense. But the act of 1788, gives the commissioners power to take timber for both roads and bridges, “ in or near” the roads, without a word about compensation.
This is the act we have to expound. But it is under all these acts,made in pari materia, all general acts, and constituting our high-way system, that the immediate question arises, — What do the words, “ in or near” the roads import? Do they mean the “any convenient timber,” of the act of 1723, or “ the most convenient adjoining timber,” of the same act ? That act makes the distinction; and unless the act of 1788, keep it up, we virtually repeal the former ; and reintroduce the very grievance, which is remedied, by the act of 1723, by paying for “ any convenient timber,” but, not for “ the most convenient adjoining timber.” And, unless the words, “ in or near,” can be made to preserve this distinction, then it is evident, that the phraseology, (“ in or near”the roads,) means the nearest timber, only; and no other,can be takenj by authority of the act of 1788. It begins with timber “ in” (the roads ;) the word “ near,” follows ; and seems, to my understanding, to import timber, next to that, which is in the road ; or, in the language of the act of 1723, “ the most convenient adjoining timber.” After such an index to what is meant, are we at liberty to give the words, “ in or near,” any other meaning ? Or, if we do, must we not, then, keep up the distinction, as to what class of timber is to be paid for, and what may be taken, without compensation, so as to preserve the system and correction of the road laws ? But, l.aying aside this illustration of the meaning of the words, “ in or near;” and supposing them of uncertain import, I ask again, are we to strain, to extend the powers of the commissioners ; or to restrict them, when we can ; and while we yet support their authority ; but in subseryiency to the established rule, that forbids implied powers to be extended to such a tribunal, in derogation of common rights ?
The answer is given in Lord Mansfield’s laconic expression, in the case of Blackfryer’s bridge, (1 Cowp. 29,) “why this is a special authority.”
For my own part, whether we take the argument from, the letter of the act, (“in or near,”) from its body and spirit, as indicated by the distinction laid down in the act of 1723, or reason, “ ab inconve-niente” I can put but one strict construction upon the powers of the *121 commissioners. They are to take none, but the nearest timber, if objected to, by the owner; unless upon compensation.
Under any other construction, the impositions might be enormous. If they could pass the oak timber, “ because it warps in the sun,” they might pass the pine, and go on' to Dawson’s cypress timber, because, it is wrought more easily; and from the cypress, to a grove of live oaks, preserved, and cherished, for some future man-of-war, because, live oak is the most lasting wood for bridges; or, if the commissioners choose, because, live oak is worth one dollar per cubic foot in the New-York market.
As Judge Burke said, in Zylstra’s case, (2 Bay, 287) — “ This is a pretension so extravagant, that it seems to me, to be paying a sorry compliment, to law. and common sense, to dwell upon arguments to' the contrary.” We may, it is true, be in no danger of seeing another Jew’s teeth extracted, in order to extort from him, his secret horde, for public purposes, without compensation. But, ic is very possible, that we may see a Christian freeholder driven to the knife, in defence of the venerable oaks, that shade his paternal burying ground. In Eaves’ case, they leaped over fences, to come at his timber. In Dawson’s, they would pass good oak, to come at pine. Once establish their claim to such a selection, and what can stop them, but the knife!
I may be, here, permitted to add, although it is rather reverting to the question first disposed of, that any one, a little acquainted with English domestic history, must have perceived, that it was the encroachments upon private property, and personal rights, that brought about the recognition of common-law principles, in the fifty odd confirmations of “ magna charta;” and that the crying grievances, were' those, which are guarded against in the 29th chapter, called “ the corner stone of English liberties.” And any one acquainted with the rationale of the American revolution, must understand, that it consisted in the self same element. Taxation, without representation,in its plain sense, is taking private property, without consent, or compensation; “ contra legem terree,” i. e. against the course and process' of common law; which required that the parties taxed, should be assessed equally; and, by their own representatives, duly appointed, and constitutionally assembled together.
In the former instance, King John usurped the power'to levy mo. ney, without the representatives of the nation. And, in the latter instance, the King, and Parliament, would have done the same forbid-den act, in this country, without American representation. And the same usurpation, in principle, led to the same confirmation of individual rights; to which the descendants of the “Barons bold,” improving upon the former model, added, national independence. “ Es-to perpetua,” is our prayer, for both, ihe one and the other. Let it be equally our practice.
But, I would ask, — are we to derive no benefit, from the experience of past generations, upon this subject! Is not only, every nation, hut every age, to weed the same field anew; and sweat the bloody sweat, for private rights? The power is in one great department of *122 our government; and, perhaps, a safe one, in their hands. But is there no stopping place? If the legislature can transfer such authority to any other tribunal, they may, to the Governor, or any other agent. And would we be, then, safe, in confiding, that the day may not recur; when, it may be again, necessary, to write, sword in hand, the emphatic words, “ Nullus liber homo,” &c. &c, “ disseisietur, de libero temmento suio.”
It not only, may, but will recur, unless their plain version, in our constitution, “ Private property shall not be taken, for public use, but upon just compensation,” be held sacred, in practice, as well as theory. Do these broad English words protect all private property; or, are they but terms, to amuse the sanguine, and impose upon the zealous? until exception, after exception, shall have fritteied away the principle. We are even now, told, that the general government, are already, laying fast hauds upon despotic power. Let us give them, at least, an earnest of what may be, by saying to the domestic department, while, yet, it is unsullied, by tyranny, — “ Obsta principiis.” Use your authority fairly, firmly, and discreetly; but give it not, to other hands, that may abuse it.
Here would I hold.
But there is another strictly legal view, under which, it appears to me, that Dawson ought to have been acquitted. The commissioners, at least, stretohed their power quite beyond the usual practice. Power is often harmless, in the hands of honest men, — especially, where all are interested, to prevent oppression. But their conduct, in this in. stance, had the assuming air of imposition, and abuse of authority, in requiring their own choice of timber, when very good was offered, and nearer at hand. Nineteen men out of twenty, would have deemed it an abuse of power. What was Dawson to do ? If he sued the commissioners merely, his timber was gone; and they would justify, or excuse themselves, under the letter of the act. Was he not, then, excusable for resisting ? and ought he to have been convicted of any offence ?
Under this view of the case, I take it as granted, that the verdict can be upheld; not so much upon the ground, that the commissioners acted, with the view to trespass as little upon the defendant’s property, as their duty permitted them ; as upon the prerogative right that they had authority to act, at their own discretion ; and that the defendant cannot but be guilty, for obstructing their power, by any opposition whatever. And my argument is, that no man can be legally convicted of any offence, for opposing the abuse of official authority, whenever such abuse reaches his person or property. And, of course, that the proper legal inquiry for the jury, ought to have been, whether the commissioners had abused their authority ; and if so, then the defendant could not be found guilty for opposing them.
Admit, that the commissioners have the general power to take timber ; yet, still, there must be some limitation to their selecting trees wherever they wish. And, if there is no express legal restriction, then, in that case, the only restriction upon the licentious use of their power, lies in the course pursued by the defendant.
I hold it a fundamental principle of law, that if an officer com *123 mits an abuse of his authority, or an apparent abuse, and thereby trespasses upon the rights of a citizen, he may defend his rights, and cannot be convicted of any legal offence ; notwithstanding the general power of the officer.
Bailey, for motion.
Elmore, Solicitor, contra.
In every such case, the individual opposing the officer, takes the consequences upon himself. If he cannot shew the abuse, by the officer, he is, himself, the trespasser, and must be convicted. But, if the abuse be apparent, criminal offence, cannot be predicated, of the defence of the rights of' property or person, against such abuse. The defendant may not be, strictly speaking, justifiable ; but he is excusable ; and cannot be found guilty of crime. The question of abuse, in all such cases, is, as a condition precedent, and must be disposed of, before any legal verdict can follow.
If a sheriff, charged with hanging a convict, were to half strangle him, on the way to the gallows, or to drag him there by the heels, the felon might resist, and repel the aggression, and yet commit no legal offence. In a word, every abuse of power is an unlawful perversion. And if the abuse of the power consists in a trespass upon the person or property of a citizen, he may oppose the trespass, and be innocent of crime.
The distinction is between power and authority. Power, without right, cannot constitute legal authority ; and any abuse of the authority, sunders the right, and leaves the naked power. The officer, who uses such naked power, is bereft of the privilege of his commission ; and whenever any man has suffered, or might have suffered, by the abuse, he comes under the peculiar protection of judge and jury, and is excusable for resisting the wrong offered.
Upon this view of the case, for the commissioners, I would say, let them have another opportunity to shew., that they practiced no abuse of their great powers; and for the defendant, let him have the same, in order to meet the very issue his case makes up, even, if under past adjudications, he can make no other defence.
J. S. RICHARDSON.